UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-cv-11531

DR. SHIVA AYYADURAI

                Plaintiffs

v.

MAYOR MARTIN WALSH, in his official capacity as the Mayor of the City of Boston,

&

BILL EVANS, in his former official capacity as the Commissioner of the Boston Police Department,

                Defendants.

**OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE OF COURT TO FILE FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

Defendants, Martin J. Walsh ("Mayor Walsh") and William Evans ("Commissioner Evans"), oppose Plaintiff's motion for leave of Court to amend to his complaint (the "Motion"). Plaintiff has essentially re-styled his opposition to the Defendants' motion to dismiss as a pleading. As a result, it should be denied on the grounds of bad faith and futility.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As generally alleged in the operative Complaint: Plaintiff obtained a permit for him to attend the Boston Free Speech Rally on August 19, 2017.[1] (Comply. ¶ 16.) At the time, Plaintiff was campaigning for the United States Senate. (Id. at ¶ 18.) Per police protocol, there were two

---

[1] The exhibit accompanying Plaintiff's complaint contradicts this allegation.

areas in which people could congregate for the rally: "Area 1" and "Area 2". (Id. at ¶ 23.) Permit holders were permitted to speak in "Area 1", while supporters of the permit holders and the press were permitted to speak in "Area 2." (Id. at ¶¶ 24-25.) Boston Police set up these designated areas to protect the speakers of the rally. (Id. at ¶ 26.) Plaintiff began speaking in "Area 1", but was forced out by the police. (Id. at ¶ 30.) Other individuals were then permitted to speak in "Area 1". (Id. at ¶ 31.) Organizers of the Boston Free Speech Rally ended the event at approximately 12:45 p.m. (Id. at ¶ 32.)

In advance of the Boston Free Speech Rally, Mayor Walsh made the following statement to the media:

> Boston does not welcome you here. Boston does not want you here. Boston rejects your message. We reject racism, we reject white supremacy, we reject anti-Semitism, we reject the KKK, we reject neo-Nazis, we reject domestic terrorism, and reject hatred. We will do every single thing in our power to keep hate out of our city.

(Id. at ¶ 37.) After the rally was over, Mayor Walsh made the following statements:

- "I want to thank all the people that came out there [sic] that message of love, not hate…to fight back on racism, to fight back on anti-Semitism, to fight back on the supremacists that were coming to our city, on the Nazis that were coming to our city." (Id. at ¶ 39.)

- "I'm not sure what was said in there. There were a mix of people that went into the free speech area. There was a candidate for senate against Elizabeth Warren." (Id. at ¶ 40.)

Following the rally, people started writing articles about the Plaintiff in which they essentially deemed him a white supremacist. (Id. at ¶ 42.)

On October 14, 2020, Plaintiff filed his complaint against Mayor Walsh and Commissioner Evans. The complaint contained four causes of action: (I) Violation of the Freedom to Peaceably Assemble; (ii) Violation of the Freedom of Speech or Expression; (iii) Violation to Petition the Government; and (iv) Defamation. At the time Plaintiff initiated the action, he was represented by counsel, who withdrew on October 27, 2020. On November 10, 2020, Mayor Walsh and

Commissioner Evans filed a motion to dismiss the complaint (ECF Nos. 9-10). Plaintiff opposed the motion to dismiss. (ECF No. 12). Plaintiff now seeks leave to amend his complaint, which contains four counts entitled: (I) violation of the freedom to peaceably assemble; (ii) violation of the right to free speech; (iii) defamation; and (iv) intentional infliction of emotional distress. Plaintiff's proposed amended complaint dismisses his claim for violation to petition the government and adds a count for intentional infliction of emotional distress. Plaintiff also seeks to change the nature of his claims against the individual defendants from official capacity to personal capacity claims. For the reasons discussed below, Plaintiff's motion must be denied.

### III.   LEGAL ARGUMENT

#### A.   Plaintiff's Motion to Amend Should Be Denied Due to Bad Faith and Futility.

Fed.R.Civ.P. 15(a)(2) provides in pertinent part: "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." But "[t]his does not mean, however, that a trial court must mindlessly grant every request for leave to amend." Aponte-Torres v. Univ. Of Puerto Rico, 445 F.3d 50, 58 (1st Cir. 2006). "In appropriate circumstances—undue delay, bad faith, futility, and the absence of due diligence on the movant's part are paradigmatic examples—leave to amend may be denied." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (citing Foman v. Davis, 371 U.S. 178, 182 (1962). "When a proffered amendment comes too late, would be an exercise in futility, or otherwise would serve no useful purpose, the district court need not allow it." Aponte-Torres v. Univ. Of Puerto Rico, 445 F.3d at 58. Here, Plaintiff's proposed amended complaint serves no useful purpose and is futile; therefore, leave to amend should be denied.

#### 1.   The Proposed Amendment Does Not Comply With Rule 8.

Fed.R.Civ.P. 8(a) provides:

A pleading that states a claim for relief must contain:

3

   (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

   (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

   (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Plaintiff's proposed first amended complaint is not a short plain statement of the facts but, essentially, his opposition to the Motion to Dismiss. The first five pages are a self-aggrandizing tribute to the Plaintiff. Plaintiff follows this with personal attacks concerning the Defendants followed by attacks on the press. Plaintiff's proposed amended complaint contains a section concerning the conditional privilege and his privity with Brandon Navom who also contends to have been an organizer of the same rally. The proposed amended complaint also impugns the integrity of a member of the bench for having ruled that a conditional privilege applied to Mayor Walsh's statements concerning the rally. The proposed amended complaint also contains approximately 50 case citations along with corresponding argument. Because the proposed amended complaint does not comply with Rule 8, the leave of Court should be denied.

   **2. Leave Should be Denied Due to Bad Faith.**

As discussed in the section concerning futility, Plaintiff's proposed amended complaint does not clarify or provide factual support for the claims. Instead, it is clear that Plaintiff's proposed amended complaint is more a political tool than a pleading. None of the new allegations in the proposed amended complaint are appropriate for a pleading and, therefore, the leave of court to amend should be denied.

   **3. Plaintiff Still Does Not Allege Viable Causes of Action.**

Counts I and II, advanced pursuant to 42 U.S.C. § 1983, concern allegations that Plaintiff's First Amendment rights were violated. Plaintiff's proposed amended complaint should be denied

due to futility.

"The First Amendment to the United States Constitution proscribes abridgement of 'the freedom of speech…or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." Coalition to Protest the Democratic Nat'l Convention v. City of Boston, 327 F. Supp. 2d 61, 69 (D. Mass. 2004) (quoting U.S. Const. amend. I). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989).

As for Count I (violation of the right to peaceably assemble), Plaintiff alleges that he was allowed to peaceably assemble. (Proposed FAC at 25) ("Walsh and Evans fully knew that Plaintiff would and did peaceably assemble to deliver a message of peace, love, and good health, as part of his Shiva 4 Senate campaign."). Plaintiff also states "40,000 agitated people" showed up which placed individuals in "personal physical harm." (Id. at 14 and 17.) Plaintiff does not allege that he was not allowed to speak or that his rally was cut short.[2] The proposed first amended complaint adds: "Officers formed a protective cordon around Plaintiff and escorted him and his campaign staff to safety away from the violence…" (Id. at 13.) The First Amendment, "does not guarantee the right to communicate ... at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). Plaintiff's proposed amended complaint fails to state a claim as Plaintiff admits that he received a permit, he was

---

[2] Nor can he. Plaintiff has posted his entire speech at Parkman Bandstand online. See https://www.youtube.com/watch?v=q9X2ZRB9GCU&t=39s
Plaintiff was only escorted by police after he had left the park. See https://www.youtube.com/watch?v=7QToJYeKD1I

permitted to assemble and was only removed from the Parkman Bandstand when there was a threat to his safety.

Count II alleges a violation of the right to free speech. "To maintain a cause of action for a violation of the First Amendment, a plaintiff must allege that his speech was in fact chilled or intimidated. The chilling effect must not be merely indirect, speculative, or too remote." Abany v. Fridovich, 862 F. Supp. 615, 621 (D. Mass. 1994) (internal quotations omitted) (citing Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir.1989)). In support of his claim, Plaintiff alleges Walsh and Evans "totally silenced Plaintiff's speech both during the Shiva 4 Senate campaign rally and afterwards, in order to engage in demagoguery in pursuit of Walsh's election victory against African-American opponent Tito Jackson." The allegation is nonsensical and incongruous with his other allegations that he was allowed to speak at the event. Here, Plaintiff was allowed to conduct his rally and to speak with those who attended without interference by 40,000 counter-protesters. Plaintiff's speech was not chilled. It's clear from the allegations of Count II that Plaintiff's freedom of speech was not violated but that Plaintiff is attempting to recast his defamation claim as constitutional violation.

### B. Plaintiff's Has Not Pleaded Defamation.

Plaintiff's defamation claim suffers the same failings discussed in Mayor Walsh and Commissioner Evans's[3] motion to dismiss. Plaintiff's proposed amended complaint does not correct those issues. The alleged statements remain privileged and not defamatory.

---

[3] The only two statements Plaintiff attributes to Commissioner Evans are: "You know what, if they didn't get in, that's a good thing, because their message isn't what we want to hear" and "Any group that's gonna come and push for hate and divisiveness - that's not what this city is - know the Mayor is against them coming. Everybody is against them coming. l don't want them to have the march or demonstration at all." (Proposed amended complaint, 10 and 12.) On their face, neither statement is defamatory.

6

### 1. The Statements Were Privileged.

#### a. Absolute Privilege

"An absolute privilege provides a defendant with a complete defense to a defamation suit even if the defamatory statement is uttered maliciously or in bad faith." Mulgrew v. Taunton, 410 Mass. 631, 634 (1991). Though Massachusetts has not yet recognized an absolute privilege in the context of a defamation claim against a high-ranking government official, federal courts, along with a majority of other states, have done so. "The United States Supreme Court has expressed two significant policy reasons for the adoption of an absolute privilege." Edwards v. Commonwealth, 477 Mass. 254, 254 (2017). "First, Federal officials should be able to discharge their duties uninhibited by the fear and distraction of lawsuits." Id., citing Barr v. Matteo, 360 U.S. 564, 569-576. "Second, an absolute privilege furthers free speech by allowing Federal officials to speak with complete candor concerning matters of public importance." Id., citing Barr, 360 U.S. at 577. "A majority of States have been persuaded by this reasoning, and have adopted an absolute privilege which shields the governor, or cabinet-level State officials, from defamation claims for statements made in the course of their official duties." Edwards, 477 Mass. at 261; see also e.g., Blair v. Walker, 64 Ill. 2d 1, 6-11 (1976) (adopting absolute immunity to shield Illinois governor from defamation claim); Jones v. State, 426 S.W.3d 50, 55-56 (Tenn. 2013) (cabinet-level State officials such as commissioner of Department of Correction immune from defamation claims arising from their official duties); Salazar v. Morales, 900 S.W.2d 929, 932 (Tex. App. 1995) (attorney general has absolute privilege to publish defamatory statements in connection with official duties). The same reasoning should apply here to afford Mayor Walsh and Commissioner Evans immunity for any alleged defamatory statements issued in the course of his official duties in connection with the Charlottesville and Boston rallies.

### b. Conditional Privilege

Even if this Court should find that Mayor Walsh's statements are not subject to an absolute privilege, they are nonetheless subject to a conditional privilege. "Statements made by public officials while performing their official duties are conditionally privileged." Mulgrew, 410 Mass. at 635. This is because "[t]he threat of defamation suits may deter public officials from complying with their official duties when those duties include the need to make statements on important public issues." Id. In these instances, "the importance of free communication outweighs the interest in protecting reputation." Id. The conditional privilege is meant to allow public officials to speak freely on matters of public importance during the exercise of their official duties. Id.; see also W. Prosser & W. Keeton, Torts § 115, at 830 (1994). A conditional privilege immunizes a defendant from liability unless he acted with actual malice, Tosti v. Ayik, 386 Mass. 721, 726 (1982), or unless there is "unnecessary, unreasonable or excessive publication," and the plaintiff establishes that the defendant published the defamatory information recklessly. Bratt v. International Business Machs. Corp., 392 Mass. 508, 509 (1984).

Here, all of Defendants' statements were made in their capacity as the Mayor of Boston or Commissioner of the Boston Police Department. The Boston Rally, which was planned on the heels of the Charlottesville Rally, received national media attention and was indisputably a matter of public concern. The public—and the citizens of Boston, in particular—had an interest in hearing what Mayor Walsh had to say regarding an upcoming, controversial event or what Commissioner Evans stated following the event. The Plaintiff cannot succeed unless he establishes the Defendants acted with actual malice or recklessness. The crux of Plaintiff's Complaint is that the Defendants mischaracterized him as a member of a "hate" group. But Plaintiff cannot prove that his statements were made with actual malice.

> *I.    The Massachusetts Appeals Court Has Already Decided That Some Of These Statements, As Well As Other Similar Statements, Are Conditionally Privileged.*

In 2017 an individual named Brandon Navom brought a nearly identical defamation claim against Mayor Walsh based upon some of the same statements that Plaintiff now claims are defamatory.[4]  Like Plaintiff, Navom alleged that he was an organizer and scheduled speaker at the Boston Rally and that the Mayor's statements to the media unfairly categorized him as a member of a hate group.  The Massachusetts Superior Court (Barry-Smith, J.) rejected Navom's defamation claim and concluded that the Mayor's statements were conditionally privileged.  The Massachusetts Appeals Court agreed:  "it was perfectly reasonable for the mayor of Boston to be concerned that the Boston rally could become a gathering place for some hate groups or violent protestors, regardless of plaintiff's specific intentions for the rally or his non-affiliation with hate groups."  Navom v. Walsh, No. 19-P-230, 2020 WL 1682818, *3 (Mass. App. Ct. Apr. 7, 2020) (unpublished), rev. denied, 485 Mass. 1101 (Jun. 11, 2020).  The Appeals Court likewise rejected Navom's argument that the Mayor acted recklessly by failing to apprise himself of the various media sources that would have alerted him to the fact that Navom was not a member of hate group—indeed, the same argument that Plaintiff here now makes:  "The plaintiff further posits that the information available through media sources would have advised the defendant that the organizers and speakers had, in fact, denied being part of any hate group.  This is not enough to plausibly demonstrate that [Mayor Walsh] 'in fact entertained serious doubts as to the truth of his

---

[4] Navom's Complaint was much more voluminous and alleged defamation based on 25 statements made by Mayor Walsh concerning either the Charlottesville Rally or the Boston Rally.  The essence of Mayor Walsh's statements in Navom's Complaint and in Plaintiff's operative Complaint are the same: both allege that following the Charlottesville Rally, Mayor Walsh did not want hate groups coming to Boston and that Mayor Walsh mischaracterized Plaintiff as part of a hate group.

9

publication.'" Id. at *5 (citing St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). See also Lemelson v. Bloomberg LP, 253 F. Supp. 3d 333, 340-341 (D. Mass. 2017) ("If a subject's simple denial is sufficient to demonstrate that the subsequent publication shows a reckless disregard for the truth, then no disputed fact could ever safely be published"). Just as the Massachusetts Superior Court and the Massachusetts Appeals Court found that the statements were conditionally privileged, so too should this Court.

### 2. The Statements Were Not Defamatory.

Even if this Court were to conclude that the statements were not privileged, Plaintiff's defamation claim still fails on its merits. "To succeed on a defamation claim under Massachusetts law, a plaintiff must show that the defendant was at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his reputation in the community and which either caused economic loss or is actionable without proof of economic loss." Stanton v. Metro Corp., 438 F.3d 119, 124 (1st. Cir. 2006) (citing White v. Blue Cross & Blue Shield of Mass, Inc., 442 Mass. 64, 66 (2004)).

Plaintiff's defamation claim fails because all of the statements were either 1) nonactionable opinions protected by the First Amendment; 2) not "of or concerning" the Plaintiff; or 3) lacking in the degree of fault required to support a defamation claim.

#### a. The Statements Are Non-Defamatory Opinions Protected By The First Amendment.

"Superimposed on any state's defamation law are First Amendment safeguards." McKee v. Cosby, ---F.3d---, 2017 WL 4675588, *3 (1st. Cir. 2017). Under the First Amendment, opinions are constitutionally protected and cannot form the basis of a defamation claim. See Gertz v. Welch, 418 U.S. 323, 339-40 (1974). Though there is no "wholesale defamation exemption for anything that might be labeled [an] 'opinion,'" Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990)

(emphasis added), in determining whether a statement is actionable, "[t]he critical question is whether the challenged statement 'reasonably would be understood to declare or imply provable assertions of fact.'" McKee, 2017 WL 4675588, *3 (citing Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 727 (1st. Cir. 1992)). This is because if a statement cannot be proven true or false, the statement is considered an opinion. See Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc., 804 F.3d 59, 64 (1st. Cir. 2015). Moreover, even statements that can be proven false still are not actionable so long as the speaker makes clear that he is expressing a subjective view rather than "claiming to be in possession of objectively verifiable facts." See Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st. Cir. 2000) (internal quotations omitted).

In addition to statements that cannot be proven true or false, "[s]tatements that contain imaginative expression or rhetorical hyperbole" are not defamatory and are protected under the First Amendment. Milkovich, 497 U.S. at 20. These types of statements typically consist of epithets or generalizations. See National Ass'n of Government Emp., Inc. v. Central Broadcasting Corp., 379 Mass. 220, 229 (1979) (holding that the word "communist" is too vague to be defamatory); see also Buckley v. Littell, 539 F.2d 882, 884-884 n.1 (2d. Cir. 1976) (holding that phrases such as "fascist" or "radical right" fall within the realm of opinion); Letter Carriers v. Austin, 418 U.S. 264, 284-86 (1974) (holding that the word "fascist" or "traitor" in the course of a labor-management dispute is not actionable); Greenbelt Co-op. Publishing Ass'n v. Bresler, 398 U.S. 6, 13-14 (1970) (holding that a newspaper's characterization of a developer's negotiating position as "blackmail" was not defamatory). This is because the First Amendment prohibits defamation actions based on loose, figurative speech that no reasonable person would believe presented facts. See Letter Carriers, 418 U.S. at 284.

"The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either." King v. Globe Newspaper Co., 400 Mass. 705, 709 (1987), cert. denied, 485 U.S. 940, 962.  To determine whether a statement is an opinion or other protected speech, a court must consider "all the words used, not merely a particular phrase or sentence." See Cole v. Westinghouse Bdcst. Co., 386 Mass. 303, 309 (1982) (emphasis added). A court must also consider "all the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." Id.  "What constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole." Cole, 386 Mass. at 310; see also Puccia v. Edwards, 1995 WL 513895, at *3 (Mass. Super. Apr. 28, 1999) (noting that calling someone a racist, without more, amounts to opinion).

Here, all the statements are not actionable because they are Mayor Walsh or Commissioner Evans's constitutionally-protected opinions. Presumably, Plaintiff takes issue with the word "hate" in the statements.  The word "hate," however, is too "loose" to be considered defamatory.  Letter Carriers, 418 U.S. at 284.  The word "hate" is more general than the words "fascist" or "communist," both of which have been rendered non-defamatory by either the United States Supreme Court or the Supreme Judicial Court.  Moreover, these statements are not capable of being proven true or false; for example, it cannot be proven true that Boston "rejects hate" or that Boston does not want to hear a "message" about "hate."  The context in which these statements were made—in the days following the Charlottesville Rally and with the understanding that the same organizers were planning to come to Boston—makes clear that Mayor Walsh was expressing his opinions about the Charlottesville Rally and that he did not welcome that type of rhetoric in Boston.  Mayor Walsh and Commissioner Evans do not lose their First Amendment rights simply

because one is the Mayor and the other the Police Commissioner.  As a result, the above statements constitute opinions, not facts, and they cannot give rise to a defamation claim.  See Pan Am., 804 F.3d at 64.

### b.      The Statements Are Not "Of And Concerning" The Plaintiff.

The statements also are not defamatory because they are not "of and concerning" the Plaintiff.  "It is a fundamental principle of the law of defamation that a plaintiff must show, inter alia, that the allegedly defamatory words published by a defendant were of and concerning the plaintiff."  New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 395 Mass. 471, 474 (1985); Eyal v. Helen Bdcst. Corp., 411 Mass. 426, 429 (1991).  A defendant need not refer to a plaintiff by name in order to defame him.  Rather, a plaintiff can prove that a defendant's words were "of and concerning" him by showing "either that the defendant intended [his] words to refer to the plaintiff and that they were so understood, or that the defendant's words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood."  New England Tractor-Trailer, 395 Mass. at 483.

Whether a communication can reasonably be understood to be "of and concerning the plaintiff" depends on the circumstances.  See id. at 478 n.5.  As with determining whether a statement constitutes a fact or an opinion, courts must consider the context in determining whether a statement is "of and concerning the plaintiff."  See Alharbi v. Theblaze, Inc., 199 F. Supp. 3d 334, 354 (D. Mass. 2016) (dismissing defamation claim based on statements clearly directed at persons other than the plaintiff).

When, as is the case here, a publication refers to a group of people rather than an individual person, additional principles apply.  First, the group-member-turned-plaintiff must show a "special

13

application of the defamatory matter to himself" in order to state a defamation claim against a defendant. See Loeb v. Globe Newspaper Co., 489 F. Supp. 481, 483 (D. Mass. 1980) (citing Arcand v. Evening Call Pub. Co., 567 F.2d 1163, 1164 (1st. Cir. 1977)). Second, though a cause of action may lie "if a defamatory statement applies to all members of a small group," a claim "cannot come within this second principle merely by denominating a small subset of a large group of plaintiffs, unless the small group so defined reasonably appears to have been identified by the text." Loeb, 489 F. Supp. at 484.

In Loeb, the Boston Globe published statements on its editorial page that the Union Leader, a New Hampshire paper, was "probably the worst paper in America" and that the publisher of the Union Leader "runs a newspaper by paranoids for paranoids." Id. at 483. Twenty-four staff members (consisting of reporters and assistants) of the Union Leader, which employed 325 individuals in total, sued the Boston Globe for defamation, claiming that the circumstances suggested that that the statements were directed at them. The Court rejected their claim, noting that the statements provided no reasonable basis to focus on these twenty-four staff members in particular. Id. at 484. The Court similarly rejected a defamation claim brought by three Union Leader editors, who argued that *they* were the likelier targets of the Boston Globe's criticism by virtue of their greater authority. The Court disagreed, finding that no "special application" to the three editors could be inferred from the general commentary published in the Boston Globe. The Court noted that merely denominating a small subset of a large group of plaintiffs is not sufficient to give rise to a defamation claim unless that small subset "reasonably appears to have been identified by the text." Id. There was nothing in the published text that specifically referred to the three editors. The same is true here. Mayor Walsh's statements, when taken in context, were not "of and concerning" Plaintiff. Turning to the first two statements at issue:

14

- "Boston does not welcome you here.  Boston does not want you here.  Boston rejects your message.  We reject racism, we reject white supremacy, we reject anti-Semitism, we reject the KKK, we reject neo-Nazis, we reject domestic terrorism, and reject hatred.  We will do every single thing in our power to keep hate out of our city".  (Proposed FAC at 9.)

- "I want to thank all the people that came out there [sic] that message of love, not hate…to fight back on racism, to fight back on anti-Semitism, to fight back on the supremacists that were coming to our city, on the Nazis that were coming to our city."  Proposed FAC at 11-12.)

The first statement was made either the <u>same day</u> or the <u>day after</u> the Charlottesville Rally.  Given this context, it is clear that the "they" Mayor Walsh is referring to—in terms of who is "spewing hate"—are the organizers and participants in the Charlottesville Rally—not Plaintiff.  The second statement, like the first, does not specify anyone by name and simply thanks those who supported a "message of love, not hate" at the Boston Rally and fought back generally against the "supremacists" and "Nazis that were coming to our City."  Like the three editors in <u>Loeb</u>, who argued that an inference could be made that the Boston Globe's article that the United Leader was "run by paranoids" was directed at them because they were the ones who decided the content of the paper, Plaintiff argues that, because he was a scheduled speaker at the Boston Rally, an inference can be made that he was part of a "hate" group.  The <u>Loeb</u> court rejected this reasoning, noting that no "special application" to a plaintiff can be inferred from general commentary.  The instant situation is even more tenuous.  It is too speculative to assume that Mayor Walsh and Commissioner Evans were referring to the speakers of the Boston Rally—let alone the Plaintiff, in particular—in his statements.  Because Mayor Walsh and Commissioner Evans's statements were not "of and concerning" the Plaintiff, they cannot be used to support a defamation claim.

    **c.**    **Neither Mayor Walsh Nor Commissioner Evans Are Not Liable For The Statements.**

Even if this Court were to find that Mayor Walsh and Commissioner Evans's statements constituted facts that were "of and concerning" the Plaintiff, Plaintiff still fails to state a defamation claim because Plaintiff is a public figure who cannot prove that Mayor Walsh and Commissioner Evans made the statements with actual malice.

"The level of fault required [for proving a defamation claim] varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003). If a plaintiff is a public figure, he "must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with 'actual malice.' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Murphy v. Boston Herald, Inc., 449 Mass. 42 (2007) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-80) (emphasis added).

There are three types of public figures: 1) all-purpose public figures; 2) limited-purpose public figures; and 3) involuntary public figures. See Gertz v. Welch, 418 U.S. 323, 345 (1974). Whether a person constitutes a public figure is a question of law. See Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st. Cir. 1998). Here, Plaintiff was a public figure; Plaintiff was a candidate for United States Senate. A public controversy existed prior to when Mayor Walsh and Commissioner Evans made their statements; the Charlottesville Rally received national media attention due to its violence and controversial viewpoints and the public was concerned that a similar rally was rumored to be taking place in Boston the following week. Plaintiff, who was running against Senator Elizabeth Warren, "thrust himself into the vortex" of that public controversy by electing to speak at the Boston rally and deliberately giving statements to the media. Plaintiff must have recognized that speaking at the Boston rally on the heels of the Charlottesville

16

was controversial. Of course, Plaintiff was free to speak at the event to champion free speech—even the speech of those who hold controversial views—but, in doing so, Plaintiff inserted himself into the public controversy surrounding the two rallies. And, given his media appearances, Plaintiff clearly had "sufficient access to the means of counter-argument" to combat any allegedly defamatory statements that Mayor Walsh made. See Butts, 388 U.S. at 155. Furthermore, as alleged, Plaintiff contends that the event was meant to be a campaign rally for the benefit of his campaign for senator.[5] For purposes of his defamation claim, Plaintiff was a public figure.

Because he was a public figure, Plaintiff must allege that Mayor Walsh and Commissioner Evans acted with "actual malice" in order to state a defamation claim. He has not done so. Plaintiff's newfound malice argument is nonsensical. According to Plaintiff, "[I]n order to defeat Tito, Defendant Walsh turned Plaintiff into his sacrificial bogeyman…" (Proposed FAC at 19.) Plaintiff's contention is wholly conclusory and unsupported by the proposed amended complaint – which fails to quote a single statement made by Mayor Walsh identifying Plaintiff. Even if the Court accepts Plaintiff's countless implausible inferential leaps, at most, Plaintiff has alleged that Mayor Walsh and Commissioner Evans should have known that he was not a member of a hate group because he denied any such affiliation in his media interviews. Plaintiff's denials are not sufficient to support the contention that Mayor Walsh or Commissioner Evans issued their statements knowing them to be false or with reckless disregard for their falsity because "such

---

[5] Presumably, Plaintiff was aware of the scheduled speakers. The Appeals Court stated:

> Biggs "was a featured speaker at the Make Men Great Again gathering ... alongside alt right and alt lite figures Augustus Invictus and Kyle Chapman," and that Biggs had "published a number of tweets promoting date rape and sexual violence, the least offensive of which was 'Every kiss begins with ... Roofies.'"

Navom v. Walsh, 97 Mass. App. Ct. 1109 n.5.

17

denials are so commonplace in the world of polemical charge and countercharge that [denials], in themselves, [] hardly alert the conscientious reporter to the likelihood of error." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 692 (1989) (quoting Edwards v. National Audubon Society, Inc., 556 F.2d 113, 121 (2d Cir. 1977) ("Surely liability under the 'clear and convincing proof' standard of New York Times v. Sullivan cannot be predicated on mere denials, however vehement….")). As a result, Plaintiff's contention that Mayor Walsh and Commissioner Evans should have known that he was not a member of a hate group because he denied being part of a hate group is not enough to prove "actual malice" and, therefore, Mayor Walsh and Commissioner Evans did not have the requisite level of fault in making the statements to support any defamation claim against them.

**B. Plaintiff Has Not Pleaded Intentional Infliction of Emotional Distress.**

Count Four of the proposed amended complaint purports to allege a claim of intentional infliction of emotional distress. The elements of an intentional infliction of emotional distress claim are "(1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 468 Mass. 379, 385 (2014); see Johnson v. Town of Nantucket, 550 F. Supp. 2d 179, 183 (D. Mass. 2008). "To show IIED, a plaintiff must assert that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community." Keenan v. Wells Fargo Bank, N.A., 246 F. Supp. 3d 518, 527 (D. Mass. 2017) (internal citations and quotations omitted). "The standard for what qualifies as such conduct has been set very high to 'avoid litigation in situations where only bad manners and mere hurt feelings are involved.'" Diaz v. Devlin, 229 F. Supp. 3d 101, 113 (D. Mass. 2017) (quoting Doyle v. Hasbro, Inc., 103 F.3d

18

186, 195 (1st Cir. 1996). While Plaintiff repeatedly blandly alleges that he suffered "severe" and "devastating" harm, he does not provide any facts that would suggest that Plaintiff actually suffered emotional distress, let alone severe emotional distress. Conclusory allegations of emotional distress are insufficient. See Ligotti v. Daly XXL Commc'ns, Inc., No. CV 16-11522-MLW, 2018 WL 1586340, at *8 (D. Mass. Mar. 26, 2018). Nothing about Mayor Walsh and Commissioner Evans's conduct should have alerted them that their conduct would cause emotional distress as their conduct was neither extreme or outrageous. Furthermore, the proposed amended complaint lacks non-conclusory allegations of emotional distress. Accordingly, the claim is futile and leave to amend must be denied.

## V.   CONCLUSION

WHEREFORE, for the reasons set forth above, Mayor Walsh and Commissioner Evans respectfully request that Plaintiff's motion for leave of Court to amend the complaint be denied.

Respectfully submitted:

**MARTIN J. WALSH AND WILLIAM EVANS**

By their attorneys:

Henry C. Luthin

Corporation Counsel

*/s/ Nieve Anjomi*
_____
Nicole M. O'Connor (BBO#675535)
Nieve Anjomi (BBO#651212)
Senior Assistants Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039 (O'Connor)
(617) 635-4042 (Anjomi)
Nicole.OConnor@boston.gov
Nieve.Anjomi@boston.gov

19

## **CERTIFICATE OF SERVICE**

      I, Nieve Anjomi, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon and non-registered participants via e-mail.

                                                                            */s/ Nieve Anjomi*

Dated: March 11, 2021                                           Nieve Anjomi