UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DR. SHIVA AYYADURAI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MAYOR MARTIN WALSH, in his official | * | Civil Action No. 20-cv-11531-ADB |
| capacity as the Mayor of the City of Boston, | * | |
| and BILL EVANS, in his former official | * | |
| capacity as the Commissioner of the Boston | * | |
| Police Department,[1] | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Dr. Shiva Ayyadurai ("Plaintiff"), who is proceeding *pro se*, brings this action against

former City of Boston ("City") Mayor Martin Walsh and former City Police Commissioner Bill

Evans (collectively "Defendants"), alleging that his First Amendment rights were violated and

that he was defamed.  [ECF No. 1 ("Compl.")].  Currently pending before the Court are

Defendants' motion to dismiss, [ECF No. 9], and Plaintiff's motion for leave to file an amended

complaint, [ECF No. 13].  For the reasons set forth below, Defendants' motion is GRANTED

and Plaintiff's motion is DENIED.

---

[1] Because neither defendant continues to serve in the role they occupied at the time of the events giving rise to this action, they would typically be replaced in all official capacity claims by the individuals who currently serve as the mayor and police commissioner.  See Fed. R. Civ. P. 25(d).  That is unnecessary in this case because, as described infra, all official capacity claims fail as a matter of law and Plaintiff's proposed amended complaint drops his official capacity claims.  See infra Section III.A.

## I.      BACKGROUND

### A.      Factual Background

The following facts are taken from the complaint, [Compl.], the factual allegations of which are assumed to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).  When deciding a motion to dismiss, courts may also consider "a limited array of additional documents such as any that are attached to the complaint," Giragosian v. Bettencourt, 614 F.3d 25, 27–28 (1st Cir. 2010), and in some cases "certain facts set out in . . . documents plaintiff[] attached to an opposition [he] filed to the motion to dismiss," Watterson v. Page, 987 F.2d 1, 3–4 (1st Cir. 1993) (considering certain documents that were attached to a plaintiff's opposition brief and noting that concerns about extraneous statements are lessened when a plaintiff introduces the documents "in order to bolster their argument against defendants' motions to dismiss").  Therefore, the Court considers the documents attached by Plaintiff to both his original complaint, [Compl.], and his opposition to the motion to dismiss, [ECF No. 12].

#### 1.   The Rally

In August 2017, Plaintiff, who is of Indian descent, was running a campaign for U.S. Senate.  [Compl. ¶¶ 4, 18].  On August 16, 2017, Plaintiff obtained a permit from the City to hold an event called the "Boston Free Speech Coalition Rally" (the "Rally") on Boston Common.  [Id. ¶¶ 16, 20]; see also [id. at 17 (Ex. 1) (copy of permit)].  The Rally was scheduled from 12PM to 2PM on August 19, 2017, one week after the "Unite the Right" rally in Charlottesville, Virginia, which lead to the death of one woman.  [Id. ¶ 21]; see generally [id. at 35–41 (Ex. 5)].

The Rally, which was not associated with the events in Charlottesville, was intended to be a place where people of diverse backgrounds could gather to voice their political concerns in a peaceful manner.  [Compl. ¶ 20]; see also [id. at 22 (Ex. 2) (Facebook post by "Boston Free Speech" stating "[t]his Free Speech Movement is dedicated to peaceful rallies and are in no way affiliated with the Charlottesville rally on 8/12/17")].  Other groups that were not associated with Plaintiff and his campaign, however, also applied for permits for the Rally.  [Id. ¶ 22].  In a media interview prior to the Rally, the outreach coordinator of Plaintiff's campaign, John Medlar, [ECF No. 12-1 at 2 ¶ 2], disavowed the violence that took place in Charlottesville, but acknowledged that "there do seem to be legitimate white supremacist groups on social media that are attempting to hijack the [R]ally," [Compl. at 38 (Ex. 5)].

On the day of the Rally, City police used temporary fencing to establish two separate areas for people to congregate.  [Compl. ¶ 23].  These areas were set up to protect speakers at the Rally.  [Id. ¶ 26].  "Area 1" consisted of a fifty-foot radius around the Parkman Bandstand in Boston Common and was intended for permit holders to speak.  [Id. ¶ 24].  "Area 2" consisted of a three-hundred-foot radius around the Parkman Bandstand that was meant for supporters of the Rally and the press to gather.  [Id. ¶ 25].

Plaintiff and approximately fifty supporters congregated inside of Area 1 for approximately forty-five minutes until unnamed City police officers forced Plaintiff out of Boston Common.  [Compl. ¶¶ 27, 30–32].  After Plaintiff was forced out, others were allowed to speak at Parkman Bandstand.  [Id. ¶ 31].  Press coverage reported that the crowd outside of Boston Common chanted, "Go home, Nazis," [id. ¶ 32], but also reported that no Rally attendees "appeared to display Nazi or Ku Klux Klan symbols," [id. ¶ 33].

2.      Defendants' Statements About the Rally

Prior to the Rally,[2] Walsh stated:

> Boston does not welcome you here.  Boston does not want you here.  Boston rejects your message.    We reject racism, we reject white supremacy, we reject anti-Semitism, we reject the KKK, we reject neo-Nazis, we reject domestic terrorism, and reject hatred.  We will do every single thing in our power to keep hate out of our city.

[Compl. ¶ 37].  Additionally, Evans said:

> Any group that's gonna come and push for hate and divisiveness – that's not what this city is about.  I know the Mayor is against them coming.  Everybody is against them coming. . . I don't want them to have the march or demonstration at all.

[Id. ¶ 38].

Defendants also made comments after the Rally.  At a press conference during the

evening of August 19, 2017, Walsh stated:

> I want to thank all of the people that came out to there [sic], that message of love, not hate, to fight back on racism, to fight back on anti-Semitism, to fight back on the supremacists that were coming to our city, on the Nazis that were coming to our city.

[Id. ¶ 39].  Evans, in addition, remarked:

> You know what, if they didn't get in, that's a good thing, because their message isn't what we want to hear.

[Id. ¶ 41].  On a news program the next day, Walsh said:

> I'm not sure what was said in there.  There were a mix of people that went into the free speech area.  There was a candidate for senate against Elizabeth Warren.

[Id. ¶ 40].

---

[2] Plaintiff does not allege the exact date on which Defendants made their remarks before the Rally, see [Compl. ¶ 37–38], however, a news article containing Walsh's remarks, which is attached to the complaint, was published on August 16, 2017, see [id. at 35, 39 (Ex. 5)].

After the Rally, people began writing articles characterizing Plaintiff as a white supremacist, and members of the public still believe Plaintiff to be a white supremacist. [Compl. ¶¶ 42–43].

### B.   Procedural Background

Plaintiff, represented by counsel, filed his complaint on August 14, 2020, [Compl.], seeking $50,000,000 in damages to compensate him for his loss of liberty and reputational damage, [id. ¶¶ 44–45].  The four-count complaint alleges that (1) Defendants, in their official capacities, violated Plaintiff's First Amendment right to peaceably assemble under 42 U.S.C. § 1983 (Count I), [id. ¶¶ 46–53]; (2) Defendants, in their official capacities, violated Plaintiff's First Amendment right to free speech or expression under 42 U.S.C. § 1983 (Count II), [id. ¶¶ 54–64]; (3) Defendants, in their official capacities, violated Plaintiff's First Amendment right to petition the government under 42 U.S.C. § 1983 (Count III), [id. ¶¶ 65–72]; and (4) Walsh defamed Plaintiff (Count IV), [id. ¶¶ 73–77].

Plaintiff's counsel withdrew after filing the complaint, [ECF No. 4], and Plaintiff has since proceeded *pro se*.  On November 30, 2020, Defendants moved to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), [ECF No. 9], and Plaintiff opposed on December 14, 2020, [ECF No. 12].  Plaintiff subsequently filed a motion for leave to amend his complaint on March 1, 2021, [ECF No. 13], which Defendants opposed on March 11, 2021, [ECF No. 17].  Defendants filed a notice of supplemental authority on July 9, 2021, [ECF No. 23], which Plaintiff opposed, [ECF No. 22].

## II.   MOTION TO DISMISS

The Court first considers Defendants' motion to dismiss before turning to Plaintiff's motion to amend, see infra Section III.

### A.    Legal Standard

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

Because Plaintiff is now proceeding *pro se*, the Court must generously construe the arguments in Plaintiff's briefing.  Bahiakina v. U.S. Postal Serv., 102 F. Supp. 3d 369, 371 (D. Mass. 2015) ("[A] document filed *pro se* is to be liberally construed. . . ." (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007))).  However, a *pro se* litigant still must comply with procedural and substantive law.  Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997).  Dismissal of a *pro se* complaint is appropriate when the complaint fails to state an actionable claim.  Muller v. Bedford VA Admin. Hosp., No. 11-cv-10510, 2013 WL 702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001)).

**B.    Discussion**

      1.    Counts I–III:  First Amendment Claims

Plaintiff alleges that Defendants violated his First Amendment rights by forcing him out of Area 1, effectively terminating the Rally before it was scheduled to end.[3]  [Compl. ¶¶ 27–31, 46–72].  Defendants argue that because any removal of Plaintiff from Boston Common against his will was not carried out in accordance with a municipal custom or policy, they cannot be held liable under § 1983.  [ECF No. 10 at 3–5].

---

[3] Plaintiff's complaint and his opposition to the motion to dismiss describe the Rally's termination differently.  In particular, the complaint alleges that City police forced Plaintiff from Boston Common whereas the opposition to the motion to dismiss maintains that police helpfully escorted Plaintiff to safety.  Compare [Compl. ¶ 30 ("Plaintiff—a legal permitholder—began speaking in the Parkman Bandstand, but the police forced the Plaintiff, and his supporters, out of Area 1")], with [ECF No. 12 at 2 ("[C]ivil unrest resulted in and around Boston Common . . . [a]t that point, rank and file Officers formed a protective cordon around Plaintiff and escorted him and his campaign staff to safety.")] and [id. at 15 ("[T]he Shiva 4 Senate rally . . . was terminated early by Boston Police officers risking their life and limb to personally escort the campaign personnel to safety.")].  Because Counts I–III allege that police officers forced Plaintiff from Boston Common against his will, see [Compl. ¶¶ 46–72], the Court takes those allegations to be true for purposes of ruling on the motion to dismiss.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  42 U.S.C. § 1983 provides a cause of action for anyone who has a constitutional right violated by a person acting "under color of any statute, ordinance, regulation, custom, or usage . . . of any State."  Because Plaintiff's claims are against Defendants in their official capacities, they are treated as claims against the City.  See Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself." (citing Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 58 n. 1 (1st Cir. 2003))).  Under § 1983,

> a local government may not be sued . . . for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible.

Monell v. Dep't. of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978).  Thus, the City can be liable under § 1983 "only if the [constitutional] violation occurs pursuant to an official policy or custom."  Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008).

Plaintiff has failed to allege that his First Amendment rights were violated due to an official City policy.  The actions of individual police officers to force Plaintiff out of Boston Common before he was ready to depart are insufficient to establish the existence of an official policy.  See Welch, 542 F.3d at 942 ("[L]iability may not be imposed on a municipality for a single instance of misconduct by an official lacking final policymaking authority." (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985))).  Instead, Plaintiff must show "that the alleged constitutional injury was caused by a formal decision of a municipal legislative body or by a person with final policymaking authority."  Id. at 941 (citations omitted).  Here, Plaintiff

does not plead facts related to any formal decision by the City which deprived him of his First Amendment rights at the Rally.  Rather, as noted by Defendants, Plaintiff acknowledges that the City granted a permit for the Rally and allowed him to gather with his supporters at the Parkman Bandstand on August 19, 2017.  [Compl. ¶¶ 16–27].  Plaintiff also does not allege any facts to support the plausible inference that Walsh, Evans, or any other person with "final policymaking authority" directed the police officers at Boston Common to terminate the Rally early.

Plaintiff similarly fails to allege that a municipal custom, as opposed to an official policy, deprived him of his First Amendment rights.  "There are two requirements to prove a claim grounded on custom.  First, the custom or practice must be attributable to the municipality . . . Second, the custom must have been the cause of and 'the moving force behind' the constitutional violation."  Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156–57 (1st Cir. 1989)).  Here, Plaintiff does not allege a general custom on behalf of the City to forcibly terminate properly permitted events.  Instead, Plaintiff focuses entirely on the events surrounding a single rally.  "[E]vidence of a single incident is insufficient, in and of itself, to establish a municipal custom . . . within the meaning of Monell."  Mahan v. Plymouth Cnty. House of Corrs., 64 F.3d 14, 16–17 (1st Cir. 1995) (internal quotation marks omitted).[4]

---

[4] The First Amendment case law cited in Plaintiff's complaint does little to support his § 1983 claims.  Two of the cases involve First Amendment challenges to criminal prosecutions.  De Jonge v. Oregon, 299 U.S. 353 (1937); Thornhill v. Alabama, 310 U.S. 88 (1940).  The others consider a challenge to a state law, Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781 (1988), and a libel suit brought by the government, McDonald v. Smith, 472 U.S. 479 (1985).  None of these cases support the plausible inference that a policy or custom of the City violated Plaintiff's First Amendment rights at the Rally.

Therefore, because Plaintiff has identified no official policy or custom that led to the violation of his First Amendment rights, Defendants' motion to dismiss Counts I, II, and III is GRANTED.

> 2. Count IV:  Defamation Against Walsh

Plaintiff alleges that Walsh's remarks were defamatory because they labeled him a white supremacist, Nazi, and member of the Ku Klux Klan.  [Compl. ¶ 75].  Walsh argues that any defamation claim against him in his official capacity as the mayor is barred by the Massachusetts Tort Claims Act ("MTCA").  [ECF No. 10 at 5].

As with his First Amendment claims, Plaintiff's defamation claim against Walsh in his official capacity is equivalent to a claim against the City.  See Surprenant, 424 F.3d at 19.  The MTCA retains immunity for public employers in "any claim arising out of an intentional tort, including . . . libel, [or] slander."  Mass. Gen. Laws ch. 258, § 10(c).  Thus, the MTCA bars Plaintiff's defamation claim against Walsh in his official capacity.  See Baer v. Montachusett Reg'l Tech. Sch. Dist., 380 F. Supp. 3d 143, 155 (D. Mass. 2019); see also Barrows v. Wareham Fire Dist., 976 N.E.2d 830, 838 (Mass. App. Ct. 2012) ("[T]he Legislature has determined that both species of defamation, libel and slander, are intentional torts for the purposes of § 10(c).").  Accordingly, Defendants' motion to dismiss Count IV is GRANTED.

## III.     MOTION TO AMEND

Having found that Plaintiff's original complaint fails to state a plausible claim for relief, the Court next considers Plaintiff's motion for leave to file an amended complaint.  Defendants

argue the motion to amend should be denied because any amendment would be futile.[5]  [ECF No. 17].

###    A.    The Proposed Amended Complaint ("PAC")

In the PAC, Plaintiff seeks to: (1) add various factual allegations; (2) add a claim of intentional infliction of emotional distress against Defendants; (3) add the City as a defendant; (4) and assert all claims against Defendants in their individual—rather than official—capacities. See [ECF No. 13-1 ("PAC")].[6]  The PAC also abandons Plaintiff's § 1983 claim alleging a violation of his First Amendment right to petition the government.

The PAC largely repeats the facts set out in the original complaint, see supra Section I.A, albeit in a narrative form and mixed with legal argumentation, but also includes additional allegations.  In relevant part, the PAC adds additional detail about the counterprotest and the media's access to the Rally.  Specifically, on the day of the Rally, a crowd of approximately

---

[5] Defendants also argue that the motion to amend should be denied because the proposed amended complaint was filed in bad faith and fails to comply with Federal Rule of Civil Procedure (8)(a).  [ECF No. 17 at 3–4].  The Court notes that the proposed amended complaint plainly fails to comply with Rule 10(b) (requiring Plaintiff to "state [his] claims . . . in numbered paragraphs"), but it will not reach the question of whether Plaintiff has run afoul of Rule 8(a) (requiring a "short and plain" statement of his claims).  Defendants have already responded to the substance of Plaintiff's claims, see [ECF No. 17 at 4–19], so the Court will exercise its discretion to evaluate the proposed amended complaint on the merits.  See Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993) ("Our federal rules promote the disposition of claims on the merits rather than on the basis of technicalities, . . . and courts should be reluctant to impose a dismissal with prejudice for a rules violation that is neither persistent nor vexatious, particularly without some review of the merits." (citation omitted)).

[6] The PAC also asserts freedom of speech and freedom of peaceable assembly claims under Article 12 of the Massachusetts Declaration of Rights.  [PAC at 25, 27].  However, "Article 12 provides rights applicable to criminal proceedings and, therefore, has no bearing on Plaintiff's current civil action."  Luckern v. Suffolk Cnty. Sheriff's Dep't, No. 07-cv-12158, 2010 WL 1172648, at *6 (D. Mass. Mar. 22, 2010).

40,000 counter-protestors gathered outside of Boston Common, [PAC at 7], and local television and newspaper reporters were unable to enter Area 2, [id. at 14].  These counter-protestors were at the Rally due to Defendants' statements that portrayed Plaintiff as a Nazi and white supremacist.  See [id. at 7, 14].  Plaintiff also alleges that the press did not cover Plaintiff's account as to what happened at the Rally due to the defamatory statements made by Defendants. [Id. at 26].  Finally, the PAC appears to abandon the original complaint's allegation that City police forced Plaintiff out of Boston Common against his will.  See [id. at 7, 18]; see also supra note 3.

### B.      Legal Standard

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend generally should be "freely give[n] . . . when justice so requires."  See Fed. R. Civ. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded.").  "[E]ven so, [a] district court enjoys significant latitude in deciding whether to grant leave to amend."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55 (1st Cir. 2008).  "Reasons for denying leave include undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility of amendment."  United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009) (citing Foman, 371 U.S. at 182).  In the context of a motion to amend, "futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  O'Leary v. New Hampshire Boring, Inc., 323 F.R.D. 122, 126 (D. Mass. 2018) (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).

"If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, the accuracy of the 'futility' label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." Hatch v. Dep't for Child., Youth & Their Fams., 274 F.3d 12, 19 (1st Cir. 2001). Under this standard, an amendment will not be deemed futile unless it fails to support a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559). "In determining whether to grant a motion to amend, the Court must examine the totality of the circumstances and 'exercise its informed discretion in constructing a balance of pertinent considerations.'" United States ex rel. Hagerty v. Cyberonics, Inc., 146 F. Supp. 3d 337, 342 (D. Mass. 2015) (quoting Palmer v. Champion Mortg., 465 F.3d 24, 30–31 (1st Cir. 2006)).

### C.   Discussion

#### 1.   Personal Liability under § 1983

Plaintiff brings his First Amendment claims under § 1983. "To establish a governmental official's personal liability under . . . § 1983, 'it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.'" Burke v. Town of Walpole, 405 F.3d 66, 76 (1st Cir. 2005) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)). In § 1983 actions, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* . . . [but] supervisory officials may be liable on the basis of their own acts or omissions." Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (citations and internal quotation marks omitted). "[S]upervisory liability typically arises in one of two ways: either the supervisor [(1)] [is] a . . . direct participant in the rights-violating incident, or . . . [(2)] supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may

contribute to a civil rights deprivation." Id. (internal quotation marks omitted).  Under either

path for supervisory liability, "the plaintiff in a Section 1983 action must show an affirmative

link, whether through direct participation or through conduct that amounts to condonation or tacit

authorization, between the actor and the underlying violation." Id. (citation and internal

quotation marks omitted).  "[L]iability cannot rest on a defendant's position of authority alone."

Ocasio-Hernández, 640 F.3d at 16.

Accordingly, for his First Amendment claims to survive a motion to dismiss, Plaintiff

must allege that Defendants, acting under color of state law, either directly participated in the

rights-violating conduct or acted with deliberate indifference such that they can be held liable for

the rights-violating conduct of their subordinates.

      2.    <u>Count I:  Freedom of Peaceable Assembly</u>[7]

Plaintiff appears to argue that he was denied his First Amendment right to peaceably

assemble because the Rally lasted for only forty-five minutes instead of the permitted two hours

as a result of the violent conduct of the counter-protesters.  [PAC at 7, 25].  Plaintiff attributes

the presence of counter-protesters and the resulting premature end to the rally to Defendants'

remarks to the media.  [Id.].  Defendants argue that Plaintiff's allegation is meritless because he

and his supporters were not prohibited from assembling on Boston Common.  [ECF No. 17 at

5–6].

---

[7] Any First Amendment claims against the City also fail because a claim against the City is the
same as a claim against Defendants in their official capacities and Plaintiff has failed to allege
any additional facts in the PAC that allow for the plausible inference that his rights were violated
pursuant to an official policy or custom.  Thus, any First Amendment claims against the City are
futile for the same reasons discussed in Section II.B.1 supra.

"The Supreme Court has declared that the First Amendment protects political demonstrations and protests." Jones v. Parmley, 465 F.3d 46, 56 (2nd Cir. 2006) (citing Boos v. Barry, 485 U.S. 312, 318 (1988)). "Well-settled law therefore enjoins the police from 'interfer[ing] with orderly, non-violent protests merely because they disagree with the content of the speech or because they simply fear possible disorder.'" Pena-Pena v. Figueroa-Sancha, 866 F. Supp. 2d 81, 88 (D.P.R. 2012) (quoting Jones v. Parmley, 465 F.3d at 56). This First Amendment right is not absolute, however, and "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." Cantwell v. Connecticut, 310 U.S. 296, 308 (1940).

Here, Plaintiff fails to allege sufficient facts to plausibly infer that Defendants caused the deprivation of his right to peaceably assemble, either directly or through the conduct of their subordinates. Plaintiff does not allege (1) that Walsh or Evans physically removed him from Boston Common themselves; (2) that Walsh or Evans directed police officers to remove him from Boston Common against his will; or (3) that deliberate indifference on the part of Walsh or Evans caused police officers to remove Plaintiff. Rather, in essence, he alleges that counter-protestors violated his right to peaceably assemble, and that Defendants should be held liable for the actions of the counter-protestors because Defendants were responsible for their presence outside of Boston Common. But, as noted above, for Plaintiff's § 1983 claim to survive, he must also allege that his right to peaceably assemble was violated "under color of state law." See Logiodice v. Trs. of Me. Cent. Inst., 296 F.3d 22, 26 (1st Cir. 2002). "A [government official] normally can be held responsible for a private decision only when [the official has] exercised coercive power or provided such significant encouragement, either overt

or covert, that the choice must in law be deemed to be that of the [government official]." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).[8] Here, Plaintiff has not alleged that Defendants coerced the counter-protestors in any way.  Also, Defendants' remarks prior to the Rally cannot plausibly be construed as the "significant encouragement" required for the counterprotest to be considered a state action because Defendants' remarks prior to the Rally do not even mention the counterprotest, let alone encourage counter-protestors to show up and disrupt the Rally.[9] Plaintiff's allegations—that Defendants made remarks prior to the Rally, and that a large crowd of counter-protestors subsequently showed up at Boston Common—are, alone, insufficient to tie the individual conduct of Defendants to an alleged violation of Plaintiff's First Amendment rights.

For these reasons, Plaintiff's motion to amend his complaint to assert a § 1983 claim based on a violation of his right to peaceably assemble is DENIED.[10]

---

[8] In Blum, the Supreme Court analyzed the Fourteenth Amendment's "state action" requirement rather than § 1983's color of state law requirement, but § 1983's color of state law "requirement is the functional equivalent of the Fourteenth Amendment's 'state action' requirement" and the First Circuit "regard[s] case law dealing with either of these formulations as authoritative with respect to the other, and . . . use[s] the terminologies interchangeably." Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 8 (1st Cir. 2015) (internal quotation marks and citations omitted).

[9] The Court also notes that the PAC cites to a news article, see [PAC at 9], attached to the original complaint which, in part, describes the efforts of local organizations—none with any alleged affiliation with Defendants—to organize the counterprotest.  See [Compl. at 39–40 (Ex. 5)].

[10] The case law that Plaintiff cites in support of his claim is inapposite.  [PAC at 25].  Gomez v. Toledo, 446 U.S. 635 (1980), establishes that a showing of bad faith by the defendant is not necessary for a successful § 1983 claim.  Hafer v. Melo, 502 U.S. 21 (1991), holds that government officials can be sued in their individual capacities under § 1983.  Neither case supports Plaintiff's assertion that Defendants violated his First Amendment right to peaceably assemble under color of state law.

3.      <u>Count II:  Freedom of Speech</u>

Plaintiff appears to allege that his right to free speech was violated because
(1) Defendants' allegedly defamatory statements ensured that Plaintiff would be unable to tell his
side of the story to the press, <u>see</u> [PAC at 26 ("By defaming this dark brown immigrant of Indian
descent as a neo-Nazi hater and support of White Supremacy, Walsh and Evans intentionally
ensured that no media outlet would come anywhere near him to report his side of the story . . .
.")], and (2) reporters were physically unable to enter Area 2 to cover the Rally, <u>see</u> [PAC at 13
("[T]he total silencing of Plaintiff and his rally . . . required keeping television reporters and their
TV cameras away from displaying the numerous brown faces at the Bandstand on the evening
news.")].  The digressive nature of the PAC renders these allegations not entirely clear, but
construing Plaintiff's filings liberally as it must, the Court considers whether such allegations are
sufficient to state a claim that his right to free speech was violated by Defendants.

First, to the extent that Plaintiff claims that the purportedly defamatory statements by
Defendants prevented him from spreading his message through the press, he fails to state a First
Amendment claim.  Under this theory, Plaintiff does not allege that Defendants prevented him
from speaking or otherwise chilled or intimidated his speech, but rather that Defendants' remarks
rendered him too toxic for the press to cover because the press believed him to be a Nazi or
white supremacist.  As Defendants note, this allegation is merely a repackaging of Plaintiff's
defamation claim.  <u>See</u> <u>infra</u> Section III.C.4.  By bringing this claim under § 1983, Plaintiff is
essentially requesting that the Court declare that Plaintiff has a constitutionally protected right to
press coverage, but it is for the press—not the Court—to decide what the media covers.  <u>See</u>
<u>Ruiz Rivera v. N.Y. Times</u>, No. 16-cv-02800, 2017 WL 11546815, at *3 (D.P.R. June 9, 2017)
(dismissing a § 1983 suit seeking to compel the newspaper defendant to write an article about the

plaintiff and noting that "[t]he Court could not find support for the premise that a media outlet must write and publish an article when requested by a private individual").

Second, regarding Plaintiff's allegation that reporters were kept out of Area 2, Plaintiff has not alleged sufficient facts to show that this would constitute a violation of his right to free speech by Defendants.  The Court acknowledges that the right to free speech may in some circumstances also include a right to be heard and may prohibit measures that render a demonstration totally ineffective.  Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1179 (11th Cir. 2009) (reversing the district court's order dismissing First Amendment claims when an organization alleged that the defendants directed police officers to take actions that prohibited a demonstration from being seen or heard by audience members or the media).  In this case, however, Plaintiff has made only conclusory allegations that the Rally was "silenced by Walsh and Evans," [PAC at 11], that Walsh and Evans "consciously and actively ensured a total information vacuum," [PAC at 14], and that "the total silencing of the Plaintiff and his rally required keeping the television reporters and their TV cameras away from displaying the numerous brown faces at the Bandstand on the evening news," [PAC at 13].  Plaintiff does not provide any detail to support these statements, and as a result, the PAC does not contain any specific factual allegations that support the plausible inferences that: (1) Defendants themselves prohibited the press from entering the Rally; (2) Defendants ordered subordinate police officers to keep members of the press out; or (3) Defendants' deliberately indifferent actions are the reason the press could not hear the Rally.[11]  In short, the PAC does not contain sufficient facts to

---

[11] Plaintiff's original complaint attached an article and an editorial published in the Boston Globe, which both discuss the press's access to the Rally.  [Compl. at 25 (Ex. 3) (Boston Globe article), 50–51 (Ex. 8) (Boston Globe editorial)].  The article states that any buffer zone between the press and the Rally was meant, in part, to dampen the voices of the Rally's speakers and

plausibly show an "affirmative link" between Defendants and any deprivation of Plaintiff's

rights, and in turn it does not state a claim for supervisory liability under § 1983.[12]  To the

contrary, Plaintiff alleges that Area 2 was set up with the specific goal of having supporters of

the Rally and the press be able to gather away from counter-protestors.  [PAC at 7 ("[S]upporters

of Permit holders and the press were supposed to be allowed to congregate and listen" in Area

2)].

Accordingly, Plaintiff's motion to amend to add a claim that his right to free speech was

violated is <u>DENIED</u>.

4.    <u>Count III:  Defamation</u>[13]

Plaintiff asserts that he was defamed, before and after the rally, in statements made by

Defendants that suggested that Plaintiff was associated with Nazis and white supremacists.

[PAC at 27–29].  Defendants argue that their remarks were not defamatory because they were

---

supports this statement by noting that Evans said that if certain speakers could not enter the Rally
"[t]hat's a good thing because their message isn't what we want to hear." [<u>Id.</u> at 25.]  The
editorial states that "[p]olice barred anyone from approaching to hear what the rally speakers had
to say" and that "[r]eporters were excluded too." [<u>Id.</u> at 51 (Ex. 8)].  Even assuming Plaintiff
intended to incorporate the article's and editorial's content into the PAC, this would not change
the Court's analysis of his free speech claim.  First, Plaintiff does not appear to be challenging
the existence of separate areas for the press and the speakers, but is instead challenging the fact
that the press was not admitted into Area 2.  Second, the article and editorial do not describe any
actions on the part of Defendants that led to members of the press being excluded from hearing
the Rally.  Evans' statement regarding speakers that were not let into the Rally does not support
the plausible inference that Plaintiff, who undisputedly attended and spoke at the Rally, was
silenced or prevented from being heard.

[12] Plaintiff also asserts that "[b]ut for Walsh occupying the post of Mayor of the City of Boston,
he would not have been able to engineer the silencing of the Plaintiff," [PAC at 14], but this
conclusory statement, without more, is insufficient to state a plausible supervisory liability claim.

[13] Any defamation claim against the City is barred by the MTCA and adding this claim would
therefore be futile. <u>See</u> <u>supra</u> Section II.B.2.

constitutionally protected opinions, not "of and concerning" the Plaintiff, and not made with actual malice.[14]

> To state a claim for defamation under Massachusetts law, a plaintiff must allege:
>
> (1) that "[t]he defendant made a statement, concerning the plaintiff, to a third party"; (2) that the statement was defamatory such that it "could damage the plaintiff's reputation in the community"; (3) that "[t]he defendant was at fault in making the statement"; and (4) that "[t]he statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss."

Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (alterations in original) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)).

As to the first element, "[i]t is a fundamental principle of the law of defamation that a plaintiff must show, *inter alia*, that the allegedly defamatory words published by a defendant were of and concerning the plaintiff." New Eng. Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper, Co., 480 N.E.2d 1005, 1007 (Mass. 1985). The most straightforward way for a plaintiff to establish this is by showing that "the defendant intended its words to refer to the plaintiff and that they were so understood." Id. at 1012. Alternatively, a plaintiff may show that "the defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff." Id. at 1010. When defamatory statements are made about a group, an

---

[14] Defendants also argue that their remarks were either absolutely or conditionally privileged. [ECF No. 17 at 7–10]. However, as Defendants themselves note, Massachusetts has not recognized absolute privilege in defamation suits against government officials. See Edwards v. Commonwealth, 76 N.E.3d 248, 254 (Mass. 2017). Additionally, any conditional privilege held by Defendants would be forfeited if the Court were to find that their remarks were made with actual malice, which is a requirement of any defamation claim made by a public figure such as Plaintiff. See Tosti v. Ayik, 437 N.E.2d 1062, 1065 (Mass. 1982) ("[I]f 'actual malice' is proved, any conditional privilege is thereby proven lost."); see also N.Y. Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); Mangual v. Rotger-Sabat, 317 F.3d 45, 66 (1st Cir. 2003) ("While the definition of 'public figure' remains opaque, political candidates unquestionably fall under that rubric."). The Court therefore declines to consider whether Defendants' statements were conditionally privileged.

individual member has a cause of action only if the size of the group is sufficiently small or the member can show special application of the defamatory statement to himself.  See Arcand v. Evening Call Publ'g Co., 567 F.2d 1163, 1164 (1st Cir. 1977) ("Defamation of a large group gives rise to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself . . . [Alternatively], a civil action [lies] if a defamatory statement applies to all members of a small group."); see also Loeb v. Globe Newspaper Co., 489 F. Supp. 481, 483–84 (D. Mass. 1980) (finding neither three editors nor twenty-four staff members of a newspaper described as "run by paranoids for paranoids" had a cause of action for defamation because material was not sufficiently specific to them); Mikolinski v. Burt Reynolds Prod. Co., 409 N.E.2d 1324, 1324 (Mass. App. Ct. 1980) (holding the alleged defamation of all actors of Polish descent in a movie did not give rise to a cause of action by an individual of Polish descent).

Related to the second element of a defamation claim, "[t]he [Supreme] Court has . . . held that only statements that present or imply the existence of facts that can be proven true or false are actionable under state defamation law." Gray v. St. Martin's Press, Inc. 221 F.3d 243, 248 (1st Cir. 2000) (citing Milkovich v. Loraine Journal Co., 497 U.S. 1, 18–20 (1990)).[15] "[A] statement cannot be defamatory if 'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts.'" Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) (quoting Gray, 221 F.3d at 248).

---

[15] The Supreme Court explained that the First Amendment "impose[s] additional limitations in defamation cases, whether or not they are also part of state law." Gray, 221 F.3d at 248.

On the element of fault, the Supreme Court has held that a public figure may recover for defamation only if a statement was made with "actual malice."  Sullivan, 376 U.S. at 279–80. Plaintiff is a "public figure."  See Mangual, 317 F.3d at 66 ("While the definition of 'public figure' remains opaque, political candidates unquestionably fall under that rubric.").  He therefore "bears the heavy, and often insurmountable burden of proving that [Defendants] acted with actual malice."  McKee v. Cosby, 874 F.3d 54, 61 (1st Cir. 2017) (internal quotations omitted).  "Actual malice" in this context is not the same as common law malice (i.e. ill-will or malevolent intent) but rather "means 'knowledge that [the statement] was false or . . . [made with] reckless disregard of whether it was false or not.'"[16]  Wofse v. Horn, No. 19-cv-12396, 2021 WL 797809, at *5 (D. Mass. Mar. 2, 2021) (quoting Sullivan, 376 U.S. at 280).

With this general framework in mind, the Court will consider each of Defendants' allegedly defamatory statements.

### a.      Walsh's Statement Before Rally

Before the Rally, Walsh said:

> Boston does not welcome you here.  Boston does not want you here. Boston rejects your message.  We reject racism, we reject white supremacy, we reject anti-Semitism, we reject the KKK, we reject neo-Nazis, we reject domestic terrorism, and reject hatred.  We will do every single thing in our power to keep hate out of our city.

[PAC at 9].

Plaintiff fails to state a plausible defamation claim with regards to this statement because he fails to allege the statement was "of and concerning" him or made with actual malice.

---

[16] Plaintiff cites Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir. 2009) for the proposition that "actual malice" in the context of his defamation claims is the equivalent to common law malice, but Noonan addresses a specific Massachusetts statute that is not at issue here.  See 556 F.3d at 28–29.

As a starting point, neither Plaintiff nor his campaign is mentioned by name in this statement.  Plaintiff alleges that Walsh intended for these remarks to refer to him but offers few factual allegations to support this conclusion.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  The mere fact that the City was negotiating with Plaintiff's campaign over a permit for the Rally does not mean that Walsh's remarks were aimed directly at Plaintiff.  As Plaintiff himself notes, Walsh's rhetoric (i.e. "[Boston] does not welcome you here . . . does not want you here") is more logically read to refer to people coming from outside of the state rather than those, such as Plaintiff, who already live here.  See [PAC at 9–10].  Plaintiff maintains that Walsh's remarks were understood "by all sectors of the public" to be aimed at Plaintiff, and that Plaintiff was "classed as a Nazi by local media [and] . . . publicly condemned by members of the Indian-American community in Massachusetts."  [PAC at 16].  Plaintiff's sole example of the local media purportedly labeling him a Nazi, however, is a headline from August 12, 2017, but he offers no facts to link this headline and Walsh's statement.  [PAC at 10]. Similarly, Plaintiff cites to a graphic, produced by a South Asian community organization that reads, "Shiva Speaks for Nazis, Not South Asian Americans."  [PAC at 16].  The graphic was not created by Walsh and there is nothing to suggest a relationship between Walsh's remarks and the graphic.

Even if Walsh's remarks could be understood to be "of and concerning" Plaintiff, Plaintiff does not allege that the statement was made with actual malice—knowledge that it was false or made with reckless disregard of whether it was false or not.  Although Plaintiff asserts that Walsh "absolutely, officially" knew the Rally was "totally benign," [PAC at 9], it is not sufficient for Plaintiff to merely plead a "formulaic recitation of the elements" of a defamation

claim.  See Twombly, 550 U.S. at 555.  Plaintiff provides no factual basis for the assertion that

Walsh knew, or recklessly disregarded evidence, that the Rally would be offering a different kind

of message than the one on display in Charlottesville the previous weekend.  The mere fact that

the event was titled the "Free Speech Rally" and being organized by the political campaign of a

candidate of Indian descent did not preclude the possibility that the Rally could have ended up

being a forum for the type of speech Walsh was denouncing.  Indeed, the outreach coordinator of

Plaintiff's campaign acknowledged that "legitimate white supremacist groups . . . are attempting

to hijack the [R]ally."  [ECF No. 1 at 38 (Ex. 5)].  Plaintiff has therefore not pled facts sufficient

to suggest he can meet "the heavy, and often insurmountable burden of proving that [Walsh]

acted with actual malice."  McKee, 874 F.3d at 61.

> b.      Evans' Statement Before the Rally

Prior to the Rally Evans said:

> Any group that's gonna come and push for hate and divisiveness – that's not what
> this city is – know [sic] the Mayor is against them coming.  Everybody is against
> them coming.  I don't want them to have the march or demonstration at all.

[PAC at 9–10].  Evans' statement prior to the Rally is not actionable because no part of it

contained defamatory material.  The statement reflected Evans' opinions that Boston is not a

place for those who "push hate" and that he would have preferred there be no rally on Boston

Common that day.  The statement does not imply any facts that can be proven true or false, but

rather represents "a subjective view, an interpretation, a theory, conjecture, or surmise."

Piccone, 785 F.3d at 771 (quoting Gray, 221 F.3d at 248).

> c.      Walsh's First Statement After the Rally

On August 19, 2017, Walsh said:

> I want to thank all of the people that came out to there [sic], that message of love,
> not hate, to fight back on racism, to fight back on anti-Semitism, to fight back on

the supremacists that were coming to our city, on the Nazis that were coming to our city.

[PAC at 11–12].  This statement by Walsh after the Rally is also not an actionable basis for a defamation claim because Plaintiff fails to allege any facts to show that it was made "of and concerning" Plaintiff.

Plaintiff asserts that these remarks were unquestionably about him.  [PAC at 17–18].  As with Walsh's statement prior to the Rally, neither Plaintiff nor his campaign were named in the remarks.  Additionally, Walsh's phrasing ("supremacists that *were* coming to our city. . . Nazis that *were* coming to our city") is most plausibly read to refer to groups that may have been planning on coming to the Rally but did not in fact do so (such as the white supremacist groups that were attempting to "hijack" the Rally).  To the extent that Walsh's remarks referred to those who did attend the Rally, Plaintiff fails to sufficiently allege a "special application" of the allegedly defamatory material to himself.  See Loeb, 489 F. Supp. at 483–84 ("[Plaintiff] state[s] without explanation that 'the [defamation] was directed at [a group]', of which [he] profess[es] to be [a] member[], but beyond that assertion venture[s] no support for a claim of the 'special application of the defamatory matter to [himself].'" (quoting Arcand, 567 F.2d at 1164)).  Plaintiff also fails to allege facts that suggest that the Rally, which was attended by approximately fifty people, [PAC at 6], was small enough that a defamatory statement about all of the attendees gives rise to a cause of action by an individual participant.  See Restatement (Second) of Torts § 564A cmt. b (Am. Law Inst. 1975) ("It is not possible to set definite limits as to the size of the group or class [where individual members can recover for a defamatory statement about the entire group], but the cases in which recovery has been allowed usually have involved numbers of 25 or fewer.").

> d.      Walsh's Second Statement After the Rally

On August 20, 2017, Walsh said:

> I'm not sure what was said in there. There were a mix of people that went into the free speech area. There was a candidate for senate against Elizabeth Warren.

[PAC at 12].  This statement by Walsh after the Rally also fails to supply a basis for Plaintiff's defamation claim because Plaintiff fails to allege facts to suggest it was false.

Unlike the other allegedly defamatory remarks cited by Plaintiff, this statement is plainly meant to refer to him because he was a candidate for the U.S. Senate at the time.  Even though the statement is "of and concerning" him, no part of this statement is false, as Plaintiff does not dispute the fact that he attended the Rally.  See [PAC at 6].  Thus, because the statement was not made with knowledge that it was false or in reckless disregard of whether it was false or not, it cannot be grounds for a defamation claim by a public figure such as Plaintiff.

> e.      Evans' Statement After the Rally

On or around August 19, 2017, Evans said:

> You know what, if they didn't get in, that's a good thing, because their message isn't what we want to hear.

[PAC at 12].  Plaintiff does not allege sufficient facts to show this statement was "of and concerning" him and thus it cannot be grounds for a defamation claim.

The Court assumes that the "they" in Evans' statement is referring to scheduled Rally speakers who were not allowed access to Boston Common.  See [Compl. at 51 (Ex. 8)].  Because Plaintiff acknowledges that he was inside Area 1 and able to participate in the Rally, [PAC at 6], these remarks could not be of and concerning him.

Because Plaintiff fails to allege sufficient facts to state a defamation claim against Defendants in their individual capacities, his motion to amend the complaint as to those claims is <u>DENIED</u>.

    5.    <u>Count IV: Intentional Infliction of Emotional Distress</u>[17]

Plaintiff's proposed intentional infliction of emotional distress claim against Defendants in their individual capacities stems from the same set of facts as his First Amendment and defamation claims.  [PAC at 29–31(alleging that Defendants "launched and managed a massive public campaign to defame this Plaintiff's campaign rally. . .")].  However, "[t]he Supreme Court has made it pellucid that a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress."  <u>Shay v. Walters</u>, 702 F.3d 76, 83 (1st Cir. 2012) (citing <u>Hustler Mag., Inc. v. Falwell</u>, 485 U.S. 46, 56–57 (1988)).  Because Plaintiff fails to state a plausible claim for defamation, his intentional infliction of emotional distress claim necessarily fails as well.  <u>See id.</u> ("The plaintiff's claim for negligent infliction of emotional distress grows out of the same nucleus of operative facts that spawn her defamation claim.  The two claims are premised upon the same conduct and harm.  They seek the same relief.  It follows inexorably that the failure of the plaintiff's defamation claim pretermits continued prosecution of her claim for negligent infliction of emotional distress.").

Therefore, Plaintiff's motion to amend the complaint to add an intentional infliction of emotional distress claim against Defendants is <u>DENIED</u>.

---

[17] Like the defamation claim, any intentional infliction of emotional distress claim against the City is barred by the MTCA and adding this claim would be futile.  <u>See</u> Mass. Gen. Laws ch. 258, § 10(c) (retaining immunity for municipalities in "any claim arising out of an intentional tort, including . . . intentional mental distress").

## IV.      CONCLUSION

Accordingly, Defendants' motion to dismiss, [ECF No. 9], is <u>GRANTED</u>, and Plaintiff's motion to amend, [ECF No. 13], is <u>DENIED</u>.

**SO ORDERED.**

August 3, 2021                                              /s/ Allison D. Burroughs
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE